Next case is Encyclopedia Britannica v. Alpine Electronics in Denso, Toyota, American Honda and Garmin 2009-10-87 There are two means plus function limitations at issue before the court here. And with respect to each, there is sufficient structure disclosed in the specification under the algorithm rule. But the district court should not have applied the algorithm rule to either limitation in this case. With respect to the retrieving means, the corresponding structure is a well-known computer function. And with respect to the accessing means, it is data or a data structure. And the court has never applied its algorithm rule to data or data structures. I would like to start with the retrieving means and then go to the accessing means. With respect to the retrieving means, there is structure disclosed in the specification. The specification discloses that the textual and graphical information is retrieved from a database. I'm having trouble, though, seeing how particularly with respect to the first retrieving means, you can avoid Aristocrat II. Obviously, every case is somewhat different on particular facts and what the claims say. But I'm not seeing much daylight, frankly, between this case and Aristocrat II. There are several distinctions between this case and Aristocrat II. The first distinction is that, to a person of ordinary skill in the art, retrieval from a database is a one-step algorithm. The second is that, unlike Aristocrat II, where the lack of algorithm went to the point of novelty of the invention, here, the alleged lack of an algorithm goes to a limitation where there's lots of prior art that, when a person of ordinary skill in the art reads the specification, it immediately calls to mind a class of algorithms. Well, but Aristocrat II was quite detailed and, in my view, quite clear. And they didn't make that distinction. There was nothing they relied on in that opinion that would suggest that there's an exception to the rule they stated, which seems to me to be quite broad. Well, this Court's prior unpublished decision in Aristocrat I does make that distinction, as does the Allvoice case. In the Allvoice case, there was a single box in a claim chart, figure 8A, and it said, go find a word in, like, a Microsoft Word document.  And the Court's decision relies upon undisputed expert testimony that a person of ordinary skill in the art could achieve that function, that function recited in the claim, using a standard Microsoft operating system call. I'm troubled by the use of the word achieve that function. That sounds like enablement to me, whether they looked at it and said, oh, I know what I have to do. Yeah. Aristocrat II made it very clear that the test on the means plus function is not the same as the test of enablement. It doesn't have to be. It isn't whether it's enabling it, whether it discloses the proper structure. Correct, Your Honor, and there is a fine line. What is the structure that is disclosed here? What is it that someone looking at the specification would say, oh, I see. This is how one performs the function. Okay. The structure disclosed for performing the retrieving of graphical and textual information is a computer that retrieves the information from a database. And does it say how it retrieves it? It says how it retrieves it when it says it retrieves it from a database. To a person of ordinary skill in the art, that is disclosing a one-step algorithm like you had in the AllVoice case, where you were just finding a word in a document. Here, the undisputed expert testimony is that that is something that one of ordinary skill in the art knew how to do when this patent was filed. But do you not read Aristocrat 2 as clearly saying that's not sufficient, that just because one of ordinary skill in the art comes in and says he would have known how to do it, that that obviates the requirement that there's some disclosure of a specific algorithm? Aristocrat 2 focuses on a situation where the point of novelty of the invention, what was new, was covered by the means plus function claim. There was no algorithm because nothing comes to mind to a person of ordinary skill in the art when they see that in the specification because nobody's ever done it before. Here, when a person of ordinary skill in the art reads a specification, it immediately comes to mind, oh, they're just retrieving information from a database. There's lots of ways to do that. And I can go buy a piece of software off the shelf where I execute that in one step. And this is really what Professor Polish was explaining that I think is a significant difference between this case and the Aristocrat 2 case. Because of the concept of encapsulation in computer science, there are certain functions that many years ago people have programmed them. And to a person of ordinary skill in the art, the function and the algorithm merge together. The undisputed evidence here is that a person of ordinary skill in the art may just be somebody who uses database systems. Well, if that person is using a database system, they know they can go buy one for which they send a single command, and the single command retrieves data from a database. And Professor Polish gives some other examples of this, saving a document to a disk. This Court's prior decisions have not required disclosure of a detailed algorithm where the information is well known to a person of ordinary skill in the art. Well, are you saying there's no algorithm involved here? No. No, Your Honor. Retrieving data from a database to a person of ordinary skill in the art is an algorithm because they can go buy a piece of software off the shelf that retrieves data from a database, just as they could in the Allvoice case. So this case is very analogous to Allvoice in that sense. And how do you get around aristocracy? Because there is, well, several ways. Number one, in this case, we disclose a one-step algorithm. Number two, in this case, there's implicit disclosure of an algorithm to a person of ordinary skill in the art. You disclosed it, or, as you just said with respect to the second, it's within the skill of the art. Right. And it depends upon what level of abstraction you look at the function and you look at the disclosed algorithm. But at the very least, the specification implicitly discloses to a person of ordinary skill in the art a class of algorithms because the undisputed testimony is that persons of ordinary skill in the art knew how to retrieve information from a database long before this patent was filed, and this Court's prior decisions have repeatedly sanctioned implicit disclosure of corresponding structure for means plus functional limitations. Let me ask you something about aristocrat. Doesn't aristocrat basically hold that where the structure is a general-purpose computer that performs or carries out the algorithm, the algorithm must be disclosed? I think broadly stated that's true, but aristocrat too did not, number one, address a situation where... Was there any algorithm disclosed in this specification? Yes, Your Honor. To a person of ordinary skill in the art, the disclosure that the software is retrieving the information from a database, to a person of ordinary skill in the art, that is a disclosure of a one-step algorithm. But that's precisely the issue. I mean, your problem, it seems to me, is that's precisely the issue that arose in aristocrat too, where the other side was actually arguing that, and they had one skilled in the art, did they not? Testimony of one skilled in the art, that they would have been able to discern it, and the Court explicitly rejected it. They said, no, that's conflating enablement and means plus function, and it's not enough just that one of ordinary skill in the art would have been able to do it. You need to disclose the structure. Am I misstating anything in aristocrat too? Your Honor, I think there's a subtle distinction. The subtle distinction is that in aristocrat too, the testimony was somebody would have known how to program this. Here, the testimony is people already have programmed it, and when somebody reads this disclosure, that class of algorithms is implicitly disclosed to them, and explicitly disclosed to them in the sense of it's a one-step algorithm. Are there fact questions here so that it shouldn't have been decided on summary judgment? Does it need to go back? Well, Your Honor, we think there's sufficient evidence in the record. There's undisputed expert testimony in the record here that a person of ordinary skill in the art knew how to retrieve information from a database. Well, we shouldn't be evaluating that, should we? On appeal? No. The district court should certainly in the first instance perform that analysis. Since little Greg in the action here, we had a glitch with our timer and it didn't begin, so you get a little free time, and if the other side needs a little extra time, we'll give it to them. So you have eight minutes. If you want to say five, you can keep going. Okay, Your Honor. Yes, I would like to keep going. One of the other distinctions between this case and the aristocrat case is that there are numerous decisions of this court which sanction the use of implicit disclosure. Dossal, Intel, Atmel, Aristocrat I, and even Aristocrat II. Near the end of Aristocrat II, there's a discussion of the medical instrumentation case, and there's a sentence which suggests that you could have implicit disclosure if one of ordinary skill in the art would know what you're talking about. Here, again, the undisputed testimony is that database retrieval was well known at the time of the invention, and when you disclose to a person of ordinary skill in the art that you're retrieving data from a database, that implicitly discloses to them a class of algorithms. With respect to the accessing means, this court has never applied the algorithm rule to data, and in In Re Lauri, this court said, data in a memory is the essence of electronic structure. It is structure by itself. Here, there is an implicit disclosure of a pathway to a person of ordinary skill in the art. The specification is quite clear. What do you mean by implicit disclosure? You mean that someone seeing what is there said, well, this includes... Let me give you an absurd example. Suppose you had a machine that was able to tie shoelaces. People having trouble bending over and so on. So there's a machine that ties shoelaces, but it discloses it's tying shoelaces. Well, I suppose you'd say there's an implicit disclosure in that, that before you tie the shoelaces, you put your foot inside the shoe. But what is the implicit disclosure here? You mean that someone who has ordinary skill in the art reading the specification would say that while it doesn't say so, I know that's what it means? Yeah, that is appropriate when you are dealing with something that is well known to a person of ordinary skill in the art. I think that would be true in your example. But maybe you could tie the shoes without the person in there. My five-year-old ties his shoes sometimes without his foot being in the shoe. But this Court's prior cases that recognize implicit disclosure, for example, the Dossal case and the Atmel case, recognize that when something is well known to a person of ordinary skill in the art, you don't need to put all of this detail in the specification. Here, when a person of ordinary skill in the art reads that, we're displaying an icon or a label, and when we click on that article or label, we get related information to that. A person of ordinary skill in the art knows you had to have a pathway to do that. What is a pathway? A pathway is simply data that is a path from one piece of information to another piece of information. Takes you from one to the other? Takes you from one to the other. Allows you to find the other piece of information. But it seems to me an aristocrat too, they distinguish those cases. When they were talking about implicit, they said that really is a question of how much detail is required. But they made quite clear that the question thus is not whether the algorithm that was disclosed was described with sufficient specificity, but whether it was disclosed at all. So they recognize there's some implicitness, but they seem to say, well, the implicit stuff goes to the specificity of the disclosure, but you still need to disclose the algorithm. Right, and here we do disclose an algorithm to a person of ordinary skill in the art. You disclose it inherently, though. Is that right? Your Honor, again, with respect to retrieving means, we contend that the disclosure is explicit. In the alternative, it's implicit, and the explicit argument relies upon the fact that when a person of ordinary skill in the art reads retrieve from a database, that's a one-step function to a person of ordinary skill in the art. The example our expert gave is what if it said means for adding A plus B? Well, the algorithm for adding A plus B is just to add A plus B. That's what a person of ordinary skill in the art would put into their software. The same thing is true here. When a person of ordinary skill in the art wants to retrieve something from a database, they do a procedure call to retrieve something from a database because long ago somebody else wrote software that allows you to retrieve data from a database. All right. Mr. Steadman, you have agreed to split your time with Mr. Hawkins? That's correct, Your Honor. And I said we'd be a little loose here, but you still owe him an obligation, I gather, to stop. I will stop whenever I am told to stop, Your Honor. Tell us, what specifically do you think should have been in this patent to satisfy aristocrats? The court has given a lot of guidance as to what will work and will not work. It's not our job as the defendants in a case where there was no disclosure to say what would have been enough, and this case doesn't present that question. Well, what you're saying is it wasn't enough, and I think we'd like to know what would have been enough. Well, in Dossal, there was a specific algorithm disclosed, but the mathematical methods for solving the algorithm were not disclosed. That was adjudged to be enough. In WMS Gaming, the court said that it was not correct under claim construction to say it was any algorithm that performed the function. It was the specific algorithm disclosed in the specification, and that was disclosed. Mr. Steadman, you're not answering Judge Lurie's question. Judge Lurie asked you what in this case should have been disclosed that wasn't disclosed, and all you're doing is telling in other cases what was held. What is your answer to that? What more should there have been in the specification than there was? I take it that's Judge Lurie's question. Well, I guess our answer to that is our guidance comes from the cases of what has been adjudged to be enough and what hasn't been adjudged to be enough. We're not in a position to say what would have been enough. If you look at the reply brief filed by my opponent, page 9, footnote 6, you will see that they are claiming that it's the specific architecture of these limitations which is the point of novelty of the invention. That's the same position they took on reexamination because they added at least some of these limitations in order to get around the prior art. We don't know what it was that's in the invention that should have been disclosed that was the point of novelty for the retrieving function and the accessing function because it was not disclosed. Something should have been disclosed, whether it was code, whether it was a pro statement of the algorithm. Give us a sentence that would suffice in your view. Well, one sentence that would be... An algorithm is a formula or a process. Yes. It's a very vague terminology. Well, I think... We'd like to get some specificity. I think if they were taking the position that they're taking now, that this was well-known and was a part of Windows, the sentence could have said, it is the well-known retrieving function used by the Windows program Excel to retrieve data from the Excel spreadsheet. Then there would at least be a known algorithm to which someone could say, is the algorithm used by the defendants equivalent or not equivalent. Your position basically, I take it, is that it's not enough to say that there was inherent in this something that a person of ordinary skill in the art would know that that's the algorithm involved. It wouldn't even have been enough if the specification itself said there are known algorithms and left it at that. And this court held in Bio Medino exactly that. The court held a bare statement that known techniques or methods can be used does not disclose structure. To conclude otherwise would vitiate the language of the statute requiring the disclosure of corresponding structure, material, or acts described in the specification. But it's kind of hard to get around in re docile in that regard, right? No, Your Honor. There's a very robust discussion of docile in Aristocrat 2. And in that case, they go back and they look at docile and the patent in docile, and they say, no, the algorithm itself was disclosed in docile. What wasn't disclosed was the technique, the mathematical technique for solving the algorithm. That was well known to people of skill in the art. But the language in docile, didn't that suggest that if you say it's known in the art, that's sufficient? It did suggest it, but that issue was resolved by Aristocrat 2. When I look at Claim 1, it has probably a dozen claim limitations. Now, it's true every claim limitation matters, but accessing information and having the means for retrieving said information seem to be fairly basic, not very novel. Are you reading from the claim? I'm reading from the claim. In the reexamination certificate? I'm reading from the judge's opinion. Did I misstate something? No, but if you look at page A80 in the appendix, which is the claim in the reexamination certificate, you will see that the words, first, retrieving means for retrieving said textual information and interrelated graphical information to said searched textual information is in italics. That is because it was added in order to overcome the prior art. But still, if it is basic stuff readily available to one skilled in the art, why doesn't it suffice? That is the position they take now, Your Honor, but as I said in their reply brief and elsewhere in this record, they admit that the specific architecture of that retrieving function and that accessing function is what the invention is, and yet it is not disclosed. But even if it were a basic function, even if it were so basic that everyone knows it, it would still have to be disclosed, and that is a matter of statutory requirement. You mean the essence of the invention? I've got 1, 2, 3, 4, 5, 6, 7, 8, 9, 10. I think what we're talking about are means clauses in clauses 11 and 12, and that's what's basic to the invention? Well, according to footnote 6 on page 9, my opponents write, and they're quoting from the record, the architecture embodied in part by the graphics-to-text pathway recited in claim 1 was an innovation that rendered multimedia searching something a child could use. They are claiming that the architecture of that particular issue is the innovation. But as I said, even if it were not, 35 U.S.C. Section 112 is a statutory mandate that requires disclosure in the specification, even if it is well known. What about Enzo? Enzo? Enzo. Didn't we find the title of a publication referred to in the specification? I believe the case is Atmel, Your Honor. Atmel, you're right. Yes, you did. And in that case, there was expert testimony that the title of the article itself was enough to disclose to a person of skill in the art a particular algorithm. Here, there is no title in the specification. There's nothing in the specification. My opponent says it's disclosed by the words is retrieved, but that's exactly the same as the claimed function, retrieving and is retrieved. I wanted to bring two things to the Court's attention during my time. One is, and it has not come up this morning in oral argument, they have an argument that the dismissal without prejudice of the 018 patent was error. They did not disclose in their brief that there was a second pending case involving that patent. We fully briefed that. In that second pending case, Judge Yackel has now found that patent itself invalid on other grounds, and that is on appeal to this Court now. So we contend there was no error, but even if there were some technical error, it is now moot because that patent has also been found invalid in a separate order. Well, we can't deal with that. What we can do is recognize that the Court said it can be dealt with in the other case. Correct, and that's why we contend it's not error. The second thing I wanted to bring to the Court's attention, and it also has not come up this morning, is that after the briefing was complete in this case, there was another case on the so-called algorithm rule. That is Blackboard v. Desire to Learn. And even more than Aristocrat, it considers almost word-for-word each of the arguments raised in their briefs and rejects them. And so we would contend that between Aristocrat II and Blackboard, every single legal issue that's raised in this case has already been decided against Britannica. There's like a six-month lag between the time Aristocrat II came down and the decision by Judge Riegel in this case. Did the parties present or offer up Aristocrat II to the District Court? Yes, in letters presented after the briefing, both parties discussed Aristocrat II. And they submitted their reasons for why it applied or not? Yes, Your Honor. Is that in the record? Are the letters in the record? I do not believe that they are in the record. It sounds like you've expanded your argument. I have one more thing I just wanted to note. You asked whether it was a fact question for remand. Because this is an issue of claim construction, it's a matter of law that this Court can decide. But with that, I yield the balance of my time if there are no further questions from the Court. Mr. Hawkins. Good morning, Your Honors. On behalf of Alpine Electronics, Inc. and Alpine Electronics of America, Inc., we have nothing more to add to the arguments. Therefore, unless the Court has some questions, the Alpine athletes respectfully submit that for the reasons stated today and in the red brief, the judgment below it should be affirmed. No one ever gets penalized for not using all their time. Thank you, Your Honor. Thank you, Mr. Hawkins. Mr. Willie has a little rebuttal time. Not much to rebut with respect to Mr. Hawkins' statement. Agreed, Your Honor. With respect to aristocrat, Your Honor asked a question during my remarks and then followed up with Mr. Stedman on the application of aristocrat and implicit disclosure. And the aristocrat addressing In re docile did not really deal with the implicit disclosure aspect of docile, which was the implicit disclosure of a computer. It dealt with the issue of whether you had to disclose any algorithm at all because only the word known algorithms was used. At the end of the aristocrat case, there is language addressing the medical instrumentation opinion, which says here as in medical instrumentation, the patent does not disclose the required algorithm or algorithms and a person of ordinary skill in the art would not recognize the patent as disclosing any algorithm at all. I suggest that that and a person of ordinary skill in the art would not recognize the patent as disclosing any algorithm at all is an acknowledgment given this court's prior decisions in Atmel, in Intel, and in docile that there could be an implicit disclosure of corresponding structure that aristocrat itself acknowledges that there can be an implicit disclosure of corresponding structure. And here, the undisputed expert testimony is that is precisely what you have because these are both well-known things. Our expert even gave examples of how these were in the prior art. We showed with the intrinsic evidence how the examiner understood the accessing means to be a pathway. That was disclosed by the hyperlink prior art. It's the same example our expert referred to. So in both of these cases, we have well-known functions that when the person of ordinary skill in the art reads the specification, they understand that there is an implicit disclosure of algorithms and in the case of the retrieving means, there is an explicit disclosure because here, there's a merger between the function and the algorithm because to a person of ordinary skill in the art, retrieving something from a database is a one-step algorithm just as adding two numbers together is a one-step algorithm just as saving a document to a disk is a one-step call to the operating system. Thank you, Mr. Woolley. We'll take the case under advisement. Thank you. 2009, 1280. Mr. Eikenson, since you're appellant, we'll hear you first. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. I am Fred Eikenson, counsel for the Appellant Home Products International, an American manufacturer of ironing boards or ironing tables. This case arises out of the Commerce Department's third administrative review of the anti-dumping duty order on these products. In that review, Commerce found that the Chinese exporter, Sins Hardware, had submitted information that was not reliable, that was false, that was unbelievable. We're basically familiar with the fact that why isn't it governed by the rule of TIFA, which follows Zenith? All right, Your Honor. I will talk about the TIFA case. There's no question that TIFA involves similar facts to our case. In TIFA, as in our case, the American manufacturer has taken an appeal from the grant of a preliminary injunction against liquidation by the trial court, and the arguments made by type by the American manufacturer in that case, Gleason, were very similar to the arguments we made. Essentially, that there was no showing of irreparable harm, immediate and irreparable harm, to the move-on, the foreign exporter. And the reason for that was the foreign exporter is not the importer of records, is not affiliated with the importer of records. Yeah, but the problem for you is this court rejected all of those. Well, I'm about to distinguish. In TIFA's case, this court found that there was harm to the foreign exporter because the court presumed that there was an agreement to reimburse the dumping duties that the importer would have to pay. And that was the finding by the court, the presumption by the court. And I can assure you that in our case, there is no reimbursement agreement from Sins Hardware to the importers who have to pay. In the record in our case, we showed that Sins Hardware stated it didn't even know the identities of the U.S. importers of record. Well, the court said, if I'm understanding you correctly, what the court said was TIFA may have the responsibility to reimburse or compensate domestic producers. It didn't necessarily conclude that it did. In the next sentence, Your Honor, the court said, in other words, this court acknowledges the distinct probability that TIFA will ultimately incur the charge or lose customers. So I suppose one could say there wasn't an explicit finding, but there was certainly a finding of probability. And in our case, there can be no such finding of probability. To complete my answer, I'm not sure the court is aware of this, but yesterday, the appellant in TIFA filed a petition for rehearing, or rehearing en banc, in which they made the argument that, as a matter of fact, there was no reimbursement in the TIFA case either. And there is really very good reason for assuming there's no reimbursement. Under the anti-dumping law, if a foreign exporter reimburses a U.S. importer for dumping duties, that is viewed as additional dumping, which will lead to additional duties. And reimbursement is effectively prohibited by the anti-dumping regulations. However, we were not... I didn't come here this morning for the purpose of criticizing TIFA. I am bound to accept TIFA. It's the... No, and I appreciate... I mean, I think it's very responsive to the kinds of questions we have. But getting back to our case, I mean, there was no... You're not critical of the CIT in our case. They didn't make any such finding. They just... The Court of International Trade here just analyzed the four factors and said in his discretion he decided an injunction was warranted, correct? He didn't rely on the fact, an erroneous fact-finding that there was money owed to the... No, the lower court didn't discuss that. This came anew from this court. The whole discussion of reimbursement and money being paid by the Chinese exporter to U.S. importers came up for the first time in this court's... And that's not a factor that the Court of International Trade in our case relied on. They simply relied on just evaluating the four factors, particularly public interest. Correct. And we addressed the court's reasoning in our main brief and in our reply brief. And we argued that there was no showing by the lower court that there was indeed irreparable harm. The lower court said if the American manufacturer loses his opportunity to challenge a duty for being too low, then the foreign manufacturer should be in a similar position. But that doesn't go to the question of where is the harm? The harm certainly is felt by the importer. The importer has to ante up, has to pay that money. The foreign exporter could be harmed by a high duty rate, as in this case, not because of the assessment on duties of a total stranger to him, but on future events. There has to be a deposit rate. Under your argument, I take it, what you say should have been done in this case is the suit should have been dismissed for lack of standing, perhaps. I don't think it was lack of standing. It was definitely not lack of standing. I thought, why isn't it lack of standing if they haven't been injured? Because I'm not suggesting they're not being injured. They're not being injured by the assessment of duties. The reason there is standing is standing is given to interested parties which are defined by statute. Let me see. What bothers me is I take it it's common ground that once these duties are liquidated, even if it were ultimately held that they had been improperly imposed, there's no way anyone can get them back. But this court has already ruled... No, is that correct? That is correct, except that that doesn't move the case. That doesn't end the case. This court has ruled that even if duties are liquidated, there still are issues that survive the liquidation. For example, whether or not the deposit rate should remain in effect is a decision that if the plaintiff wished could challenge. Additionally, there have been cases in this court where American manufacturers have elected not to seek an injunction against liquidation because the concern of the American manufacturer... This was in the Gerdeld case. The concern of the American manufacturer was you want to be sure that there were not three successive years where the foreign respondent had de minimis or zero margin because then he would have been eligible for revocation. So in that case, this court agreed with the manufacturer over the objections of the United States and the foreign respondent that the controversy survives the liquidation case. So in the absence of an injunction in this case, what survives for the appellee here? Well, the appellee is unhappy with the way in which the Commerce Department determined what the duty rate should be. The duty rate does not just apply to past entries. It applies to the deposit on imports going forward. So that survives. That survives, but they can't recoup for past entries. Well, it's not for them to recoup because it's not their money. The importer could have been a party in this case and could have sought liquidation. Our argument, I mean injunction, our argument would be completely different because the importer would be harmed. He would be irreparably harmed if there's liquidation. The foreign manufacturer is not and the question then remains does this case become moot? And this court has stated in analogous circumstances that it does not become moot. The only issue in this case, I take it, is the propriety of the duties imposed in the third administrative review. The first two, there was nominal duty imposed. You are correct. That is not involved in this case. Now, and if in the future there may be a fourth or a fifth administrative review, I don't know how long it goes on, how long the order is effective. Your Honor, today, if imports come in from Sense Hardware, they have to pay 157.68% by reason of this Congress Department's decision in the third review. But that can be re-litigated, can't it? And determined in another administrative review. A different issue would be re-litigated. What would be litigated in another review is how much duty should have been assessed on the importer. We're talking now about current business operations. Since Hardware wants to ship ironing boards to the United States importer, that importer is going to have to pay 157.68%. And the chances are there's going to be very, very few imports under these circumstances. So since Hardware could try to convince the court that the Commerce Department's decision was wrong, that the duty should be reduced, then a new deposit would go into effect if they are successful, and that new deposit could help them in their current business. That is a function of the third review results, Your Honor. The third review results were not just limited to the assessment issue. I see that my warning light has come on. Well, you finished the answer. That responds to Judge Friedman's question. From my perspective, I don't know if I've answered it fully. But I did want to make one other point before I sat down. And that is, again, how we distinguish our case from the TIFA case. In TIFA, because this court found irreparable harm, the court applied a sliding scale and essentially gave TIFA a pass on likelihood of success on the merits. The court said that I don't see anything in TIFA's argument that convinces us that they're right, but nor do I see anything convincing in the American Manufacturers' argument either. And given that we apply a sliding scale, this is sufficient. Our case is different. We have a very strong argument that there's no case on the merit. In our case, the Commerce Department applied a margin that was based on an actual calculated margin for another Chinese manufacturer in a previous segment. There's a lot of case law that supports the use of prior margins in this manner. Additionally, we showed in our papers that we submitted a very lengthy case brief in which we cited statute, judicial precedent, administrative precedent supporting this position. The other side just said, no, we're wrong, but they did not cite a single legal authority. The Commerce Department agreed with us and they used 157.68% margin. I don't think there's any realistic way to find that there is a likelihood of success on the merits, no matter how liberal a standard you wish to impose. Thank you. Well, Mr. Eikenson, we'll save the remainder of your rebuttal time. Thank you, Your Honor. Ms. Silverbrand, you've agreed to split your time with Mr. Whistler? Yes, Your Honor. Okay. Well, I'll let you know when you're approaching the dividing point, but I'll leave it to you to work it out. Please proceed. Thank you, Your Honor. May it please the Court. TIFA is clearly controlling. There's no way around it here. Well, maybe so, maybe not. I mean, the other slide pointed out to a portion of the opinion, and I read it kind of as he did, which is that the Court seemed to rely on the fact that the Court acknowledges the distinct probability that TIFA will ultimately incur the charge or lose customers. Thus, the trial court did not clearly err in determining they would suffer immediate and irreparable harm. Where is the comparable fact finding in your case? Well, Your Honor, I respectfully disagree that the Court relied on that for its finding that there would be irreparable harm. At 1380... Well, it's kind of hard to get around the word thus right following what I said. I mean, it says, thus, the trial court did not clearly err in determining they would suffer irreparable harm without an injunction. Right, but if you go two sentences up in the opinion, Your Honor, the Court first stated, though Gibson makes the dubious contention that TIFA will suffer no harm because it did not directly post any of the cash deposits for the entries, these potential overcharges would remain a part of any transaction between TIFA and its domestic importers. Similarly, here, the transactions at issue do remain a part of the relationship between Sins Hardware and its importers. Is there a distinct probability that they'll incur the charge or lose customers? Is there anything in the record with regard to that fact finding? There's certainly nothing in the record to that, Your Honor, but it stands to reason that there would be a distinct probability that they would lose customers if... What about incur any charge, that they would have to cover any charges? I don't believe there's any evidence of reimbursement, Your Honor. But you think the losing customers is comparable? I think the losing customers is comparable and I think the TIFA Court based its finding of irreparable harm not on that. That was just a portion that was responding to Gleason's, quote, dubious contention. Rather, TIFA based its opinion, the TIFA Court based its opinion on Zenith, which held that a case can and most often will become moot, an anti-dumping case, if an injunction is denied. It's a statutory right that is granted to importers, exporters, and domestic affected parties that participated in the administrative review to participate in a challenge to the anti-dumping duty proceeding. That is what Sins Hardware is doing here. Well, the part that becomes moot is the retroactive part, not the prospective part, right? No, not necessarily, Your Honor. Once a new administrative review is completed, if there's no injunction and the entries have been liquidated, the case is moot. But isn't it correct that unless and until there is a liquidation of these duties, duties set in the third administrative review will have to be deposited on any new imports? On any new imports until there is another administrative review conducted by the Department of Commerce, Your Honor. Is there an administrative review, is the fourth administrative review now going on? I believe there was a one-year deferral, so there will be the equivalent of what would have been the fifth administrative review, which will be completed next year, I believe, Your Honor. And that will set a new deposit rate. If there's no injunction and this case is not completed at this point, all entries will either be liquidated by customs or will liquidate by operation of law pursuant to statute. And therefore, the case will, in fact, become moot. All entries during the period of the third administrative review, is that right? All entries, yes. They're not going to liquidate any entries after the third period of review? Not if those are challenged, Your Honor, in an administrative review and a subsequent judicial challenge. However, since hardware could be put in the untenable position of constantly going to court and having its case mooted because no injunction was granted, and you'd have an endless cycle of since filing cases in the CIT, no injunction granted, and then all the entries get liquidated with no resolution. Now, we don't know there won't be any injunction granted. Who knows what's going to happen? Yes, Your Honor. Well, it sounds to me that the government here is advocating a kind of per se rule. In every one of the cases, the statement you had to compel us to affirm the injunction here was, if not, all of this is going to be mooted by liquidation. Well, that's true in each and every one of these proceedings. We don't need to apply four factors to figure that out if that's the endgame that requires an injunction in this circumstance. No, Your Honor, because the court not only must look at the potential for irreparable harm, the court must look at whether there's a substantial probability of success on the merits. And here, what we are advocating is that, in certain cases, there is no possibility of any success on the merits. And, for instance, the CIT last week denied an injunction which we did not consent to because the plaintiffs merely raised an issue that has been repeatedly litigated in this court and, in fact, denied. So the government is conceding there's at least a substantial claim here that has a likelihood of success on the merits? There is a statutory right for SINCE Hardware to bring the claim it has. It has stated a claim in its complaint. We don't concede that there's a substantial likelihood of success on the merits. Well, wait a minute. You say he has a statutory right to bring his suit and therefore he's entitled to an injunction even though the claim should turn out, when you look at the merits, to be frivolous? No. It has to be a substantial sort of claim. I mean, it has to be a claim that has some semblance of substance to it. Yes, certainly, Your Honor. And we would never consent to an injunction if the complaint failed to state a claim, if there was lack of jurisdiction, if the complaint only stated a claim that had been repeatedly litigated and denied by this Court, such as the case I was referring to last week in the CIT. There are many instances in which the government will not consent to an injunction. But when we do, we believe that the plaintiff, although may not prevail in this claim, has in fact stated a claim which is litigable in both the CIT and this Court. So what's the government's rule then? A preliminary injunction follows in the absence of the claim being frivolous? What's the rule? I mean, it seems to me you're kind of rewriting the four factors. I mean, you are really advocating a pretty broad blacklist, you know. No, I think it's something certainly greater than a frivolous standard, Your Honor, because I don't think a plaintiff that files a complaint that contains allegations that, for instance, in which the plaintiff failed to exhaust its remedies, is necessarily frivolous, but we would certainly oppose an injunction in that case. I don't think it's necessarily frivolous for a plaintiff to file a claim in which it is making a novel argument on an issue previously decided by this Court, but we would oppose an injunction in that case. And the irreparable harm here is that they lose their ability to challenge this. Yes. Is that how you would articulate the irreparable harm? The irreparable harm is that if these entries are liquidated, there's the distinct possibility that Sins Hardware will lose any chance to continue this case. Moreover, they do, in fact, lose any ability for the importers to recover the deposits, although that money would not necessarily be reimbursed by Sins Hardware. How does the fact that the importers lose any opportunity to recover the money adversely affect the manufacturer? These are... I mean, psychologically it may, and customers may say, we don't want to deal with you because you're not standing behind us, but I don't understand as a legal matter how you say that if you're going to lose money as a result of something, I am injured. Because when a manufacturer is seeking customers, those customers are assuming there's either going to be a no anti-dumping duty rate or a lower anti-dumping duty rate. And if Sins Hardware is unable to challenge that rate, it may, in fact, lose these customers in the future. They have every opportunity to go to another producer of similar merchandise. So that rises to the level of irreparable harm? No. That... The zenith question rises to the level of irreparable harm, Your Honor. It's the fact that Sins Hardware will, in fact, lose any ability to... Well, this case could and most likely would become moot before the legal challenge is completed. It rises to irreparable harm, Your Honor. For these reasons and those stated in our brief... May I ask you one question? Yes, Your Honor. Is it your position that if these duties were liquidated, this case, the issue in this case would be moot? The case would become moot as soon as a new administrative review was completed, Your Honor. Yes. Thank you, Your Honor. Thank you, Mr. Silverplan. We'll hear from Mr. Whistler. Good afternoon. May it please the Court, I'm Ron Whistler from the law firm of Barber-Shubert, and we represent Sins Hardware. It's our view that the TIFA case in affirming zenith, that there's no question of irreparable harm in this case, and everyone's been focusing on the money. It's not the money. It's my client's right to judicial review. That's what the irreparable harm is. We would be denied our right to judicial review. To be entitled to judicial review, you have to make an argument and state a claim of substance, don't you? Yes, and we did that, and that's what I would like to focus on. I'm curious about what is your basic claim, stated simply? Okay. In the complaint, there were three complaints. One is the factual determination that adverse facts available should be applied. Okay, that's one. Two, even if adverse facts available is applied, one, only partial adverse facts available should have been applied to the information that was tainted, but information that was not subject to the conduct that is being complained about, such as the U.S. price information and the factors of production information, that should not have been thrown out, and also the information regarding separate race and status should not have been thrown out. That was the second. And then the third one is even if the court does not believe that partial facts available should have been used, the last claim we raised was when they applied facts available, they applied to since hardware the China-wide rate, the 157 percent rate. And that rate is to be applied to companies that are not privately owned and that do not operate free from government control. And the administrative record in this case shows that since hardware, not only in this review, but in the first two previous reviews in the initial investigation, operated free from government control. So we're saying even if facts available should be applied totally, the use of that 157 percent rate was not correct and an alternate rate should be used. So we are raising substantial legal issues. So given that there's a very high degree of injury, which is not having our rights to judicial review, the sliding scale approach lowers the amount we need to show success on the merits. Are you, do you read TIFA as having concluded that your right to judicial review is the irreparable harm that you were said to suffer in this case? Yes, that's right. I read it as that. I do not, I think that the talking about the reimbursement, I find that dicta and to be quite honest, it's not very good dicta. But a right to judicial review isn't worth anything if there's no chance you prevail on the merits. Okay. Oh, the third point. The third point I raised. Already three cases for the Court of International Trade have determined it's unlawful for the Department of Commerce to apply the China-wide rate to a company that has established that it operates free from government control. The Sharon case, Green Fresh, and TIFA. And unfortunately, the TIFA case that came down at the CIT came down after this litigation. So at the time of the litigation, there were two cases, Green Fresh and Sharon, that shows that you cannot apply this China-wide rate to a company that established it operated free from government control. And were those all cases in which the Commerce had found that the company, the Chinese exporter had made false statements? Well, the best case for that would be Green Fresh, because in the Green Fresh case it was also... Never mind the best case. Were those cases comparable to your cases? I would say the Green Fresh is... In your case, the Commerce said we can't rely on the figures that you have presented to us because they're false. I mean, it seems to me it's a quite different situation where you say you can't rely on the figures and you can't rely on the information submitted by the exporter. In Green Fresh there was also misconduct. But as in Green Fresh, in this case the DOC made a preliminary determination that the company operated free from government control. Now, all the information, the false information provided had nothing to do with the government control. It only was limited to market price. The purchase of market economy inputs had nothing to do with the company's status as a separate rate company. But a company who submits false information may be thought to be unreliable and therefore you can't accept other information they've submitted. That is a possibility but then I would say that the Department of Commerce has to make findings but the Department of Commerce did, in my view, was make just a conclusionary statement without looking at what was submitted and what was you know information that was submitted that was tainted and other information that was submitted that was never contested. Thank you, Mr. Wislaw. Mr. Eikenson has a little rebuttal time. Your Honor, if I may with regard to counsel's last comment, I've been practicing for 41 years. I have never seen a statement from the Commerce Department      submissions as detailed and as extensive as the Department of Commerce has. I have never seen a statement from the Commerce Department showing            Department of Commerce has. I have never seen a statement from the Commerce Department as detailed and as extensive as the Department